IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CHAMBERS
U.S.D.C. Atlanta

JAN 0 5 2010

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

UNITED STATES OF AMERICA,

    Plaintiff,

                           CASE NUMBER: 1:07-CR-131-JEC

v.

ONESSIMUS M. GOVEREH,

    Defendant.

## ORDER and OPINION

This case is presently before the Court on defendant's Motion for James Hearing [14], defendant's Motion in Limine [50], defendant's Motion for Judgment of Acquittal [98], and defendant's Motion for New Trial [99]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion for Judgment of Acquittal [98] and Motion for New Trial [99] are **DENIED**.

### BACKGROUND

Onessimus M. Govereh ("Govereh" or "defendant") ran the Norcross, Georgia office of Icon Tax Service from January 2, 2007 until February 15, 2007, when he was arrested. (Tr. [115] at 1024-25, 1086-90, 1118.) During that time, 107 personal income tax returns were filed electronically using Govereh's Electronic Filing

Identification Number ("EFIN"), which he had obtained from the Internal Revenue Service ("IRS"). (Tr. [108] at 152-56; Tr. [113] at 586-89; Tr. [114] at 901, 970-71.) Each return bore Govereh's name as the tax preparer, and a copy of each return was saved on a password-protected computer he used. (Tr. [108] at 152-56; Tr. [113] at 586-89; Tr. [114] at 901.)

Govereh was charged with twenty counts of filing false claims based on twenty returns that were filed in January 2007 in violation of 18 U.S.C. § 287, the False Claims Act (FCA).[1] (Indictment [1].) Fourteen taxpayers testified that Govereh had prepared their taxes, and most of them told essentially the same story. (See generally Trs. [108], [112], [113], [114], [115].) Govereh sat at a computer and entered information while the taxpayers talked to him. (See, e.g., Tr. [113] at 299.) He entered false information on their returns, including false information about dependants,[2] earnings, and educational expenses. (Id.) Govereh also did not show his customers

---

[1]    Although the prosecution could have potentially charged Govereh with 107 counts, apparently out of considerations of efficiency and a desire not to extend trial time unnecessarily, it chose to prosecute him on only 20 counts.

[2]    Govereh also sometimes offered to "sell" his clients dependents. (Tr. [108] at 266-68; Tr. [114] at 818-19, 832.) That is, defendant would use the names and social security numbers of dependents of other individuals and affix these to the returns of clients in order to increase those client's refunds. The clients would be charged an additional fee for this service.

2

the returns he filed for them, so many were surprised to see the false information when they finally saw their returns. (Tr. [108] at 268-70; Tr. [112] at 301, 305, 327, 349; Tr. [113] at 507.) In all the returns, Govereh claimed that the taxpayer was entitled to substantial Telephone Excise Tax Refund ("TETR") credits, even though he never discussed telephone use with any of them, nor did any of them provide any documentation about telephone use. Moreover, it is inconceivable that any individual would ever incur excise taxes in the amount claimed on their returns.[3]

Govereh's scheme utilized a process called Refund Anticipated Loans ("RAL"). A taxpayer whose return indicates that a refund is due can file for such a loan through an approved intermediary, such as Govereh, in advance of actually receiving the refund from the IRS. The bank that issues such a loan receives a certain commission from that loan and ultimately receives a check from the IRS in the total amount of the refund. A bank will not issue a loan in the full-agreed upon amount until the return is actually filed with the IRS, and, for the tax year 2006, no return could be filed electronically before January 12, 2007. Nonetheless, the participating banks--HSBC

---

[3]. Taxpayers were able to claim credit for telephone excise taxes paid between February 2003 and August 2006. (Tr. [108] at 103-05.) The standard tax credit for TETR ranged from $30 to $60, which would have yielded, at most, total credits in the amount of $6420. Govereh's 107 forms, however, listed TETR credit amounts totaling approximately $469,000. (*Id.* at 102-03; Tr. [114] at 910.)

AO 72A
(Rev.8/82)

Bank and Santa Barbara Bank and Trust ("SBBT")--permitted Govereh to print a check up to the amount of $1600 prior to filing the return, and once the return was actually filed electronically after January 12, the bank sent a check for the balance of any refund due. See generally Tr. [112] at 430, 435-36.

Govereh had his customers cash both the advance check and the second loan check at the check-cashing business next door and return with his fees, which were often several thousand dollars. (Tr. [108] at 270-73; Tr. [112] at 329-332, 352, 444-46; Tr. [113] at 489-93.) When the IRS ultimately refused to fund the claimed refunds and the banks contacted the customers about repaying their loans, many were surprised to learn that they had even been parties to a loan. (Tr. [112] at 329, 355; Tr. [113] at 493-94.) Both banks ultimately discontinued working with Govereh because of the high fees that he was charging his clients and because of a high loan-loss ratio. (Tr. [112] at 422; Tr. [113] at 683.)

Govereh was convicted by a jury on January 16, 2008, following a trial before this Court, on fourteen counts of presenting or causing false tax returns to be presented to the IRS. (Jury Verdict [93].) Defendant now moves for judgment of acquittal or for a new trial. (Mot. for J. of Acquittal [98]; Mot. for New Trial [99]).

4

## DISCUSSION

### I.  Motion for Judgment of Acquittal

Defendant moves for judgment of acquittal under Federal Rule of Criminal Procedure 29(c).  (*See* Mot. for J. of Acquittal [98].)

#### A.  The False Claims Act Applies to Defendant's Claims.

##### 1.  The False Claims Act is Construed Broadly.

Defendant argues that the False Claims Act (FCA), under which he was convicted, does not apply to the claims he made to the IRS. The FCA provides in relevant part: "Whoever makes or presents . . . to any department or agency [of the United States], any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned."  18 U.S.C. § 287.

In *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968), the Supreme Court interpreted the FCA to include "all fraudulent attempts to cause the Government to pay out sums of money." *Id.* The Supreme Court has further determined that the FCA and the term "any claim" must be construed liberally to effect the FCA's broad purpose of protecting the government treasury from fraudulent claims. *Hubbard v. United States*, 514 U.S. 695, 703 n.5 (1995).  Furthermore, the FCA punishes the mere submission of fraudulent claims for payment, regardless of whether the Government pays them.  *United*

AO 72A
(Rev.8/82)

States v. Coachman, 727 F.2d 1293, 1302 (D.C. Cir. 1984) ("there is no requirement that the claim has actually been honored") (citations omitted).

This statute has been applied to protect the Government from a wide range of fraudulent claims, including tax returns that claim refunds to which filers are not entitled. *See United States v. Lyle*, No. 06-16574, 2007 WL 2344873, at *4 (11th Cir. Aug. 17, 2007) (defendant who filed tax returns using false information); *United States v. Morton*, No. 07-14803, 2008 WL 5077733, at *2 (11th Cir. Dec. 3, 2008) (defendant tax return preparer who created false tax returns as part of RAL program); *United States v. Barnes*, 324 F.3d 135, 137 (3d Cir. 2003) (defendant who filed false claims for refunds from IRS); *United States v. Nash*, 175 F.3d 440, 444 (6th Cir. 1999) (defendant who presented false, fictitious, or fraudulent claims for tax refunds).

### 2. Defendant's Electronic Returns Qualify as "Any Claim."

Defendant advances a technical challenge against the applicability of the FCA to his conduct, claiming that because he was sloppy in his submission of paperwork to make these claims for refund to the IRS, the requests for refunds did not really constitute a claim for monies to be refunded. He makes this claim notwithstanding the fact that he was seeking to have the IRS pay these monies to the

6

banks lending the money and the fact that his claim to the IRS was sufficient to cause banks to issue refund checks in reliance on the refund checks that they expected to be forthcoming from the IRS. (Supplemental Br. [125] at 32-39.) Specifically, defendant argues: (1) that the claims were not properly executed pursuant to IRS regulations, as the electronic portions of Form 1040 do not qualify as returns because they did not include a signed form 8453 and (2) that his customers did not sign their returns, so the IRS could not have regarded those forms as having been properly filed. (*Id.*)

The Court finds these arguments to be without merit. The 107 returns that Govereh filed with the IRS, which were received by the IRS, were indeed "fraudulent attempts to cause the government to pay out sums of money," regardless of whether the paperwork was submitted properly. *Neifert-White Co.*, 390 U.S. at 233. Given the breadth with which the FCA is to be construed, defendant cannot escape criminal responsibility based on this professed technicality. Accordingly, defendant's returns constitute claims under the FCA.

Indeed, given the laxness with which the IRS and other federal agencies often issue benefit checks to those who apply for them--even though a bit of due diligence from those agencies could often thwart readily discernable fraud on the American taxpayer--there are sound practical reasons behind the notion that the FCA should be applied broadly and should focus on the conduct and intent of the claimant,

7

and not on any assumption that the agency will be able to ferret out any improper claim through its own internal procedures.

Similarly, the existence of internal Treasury Department regulations indicating that a return is not considered to have been filed unless certain prerequisites have been met by the filer does not exempt the defendant from culpability under the FCA, as the Government did not charge the defendant with the narrower offense of filing a false income tax return.[4]

---

[4] The defendant has filed a *pro se* Reply Brief [138]. As defendant has counsel, the Court has not considered his Reply Brief. Indeed, defendant has previously caused himself some problems by his habit of filing pleadings and sending letters to the Court. For example, at trial, the Government wanted to introduce a letter that the defendant had sent to the Court making clear the defendant's extensive knowledge of tax law and the process for filing refunds. Such evidence was probative, as it impeached the defendant's protestation to the jury that he was unschooled in tax law.

Albeit these letters constituted persuasive admissions of knowledge of tax law by the defendant, the Court did not consider it appropriate, on Rule 403 grounds, to allow the Government to introduce letters from the defendant to this Court. Nonetheless, the Court cautioned the defendant to stop sending such communications to the Court. (Tr. [114] at 865-68).

Further, even were this Court willing to consider defendant's *pro se* brief, he has introduced a new argument in that brief concerning the inapplicability of the FCA where a false income tax return has been filed. As a preliminary matter, when a party introduces a new argument in a reply brief, the Court may either strike it or permit the non-moving party additional time to respond to the new argument. *Int'l Telecomms. Exch. Corp. v. MCI Telecomms. Corp.*, 892 F. Supp. 1520, 1531 (N.D. Ga. 1995). The Court in this case strikes this argument. *See, e.g., United States v. Ga. Dep't of Natural Res.*, 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) (striking arguments raised for first time in reply brief).

AO 72A
(Rev.8/82)

### B. There Was Sufficient Evidence at the Trial for a Reasonable Jury to Find the Defendant Guilty Beyond a Reasonable Doubt.

#### 1. Standard for Rule 29

When determining whether to grant a post-trial motion for judgment of acquittal, the Court must determine "whether the evidence, examined in a light most favorable to the Government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *United States v. Williams*, 390 F.3d 1319, 1323-24 (11th Cir. 2004) (citations and internal quotation marks omitted). Moreover, when determining sufficiency of the evidence, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990) (citation omitted).

#### 2. Sufficient Evidence Existed for Jury to Convict.

Both documentary evidence and testimony permitted a reasonable jury to find the defendant guilty beyond a reasonable doubt. First, the Government presented an extensive amount of documentary evidence, including 107 returns that listed defendant as the tax preparer, all of which were stored in a password-protected computer in his office.

9

(Tr. [108] at 152-56, 206-13; Tr. [113] at 586-589; Tr. [114] at 874-67, 901.) Although defendant argues that no taxpayer actually saw him prepare the form (Supplemental Br. [125] at 40), the evidence supports an inference that he did so.

Second, numerous witnesses provided testimony that would permit a reasonable jury to find the defendant guilty beyond a reasonable doubt. Eight witnesses testified that they gave defendant pertinent tax and personal information, defendant appeared to enter the information into the computer, and defendant told them he would call them when their checks arrived. (Tr. [108] at 263-64; Tr. [112] at 296-300, 305, 325-27, 345-47, 439-42; Tr. [113] at 485-87, 539-40, 550-54.) Defendant openly spoke with some of them about claiming false dependents on their returns so they could gain more money. (Tr. [108] at 266-68; Tr. [114] at 818-19, 832.) He never showed them their returns, but when their checks arrived, he told them to cash them immediately at the check-cashing business next door, and then return with his fees. (Tr. [108] at 270-73; Tr. [112] at 329-32, 352, 444-446; Tr. [113] at 489-93.) Kenndric Roberts ("Roberts"), who worked for the defendant at the latter's tax preparer office, testified that defendant took credit for preparing Roberts' taxes in January 2007 and that defendant prepared and filed all his customers' returns from his desktop computer. (Tr. [114] at 804-06.) Roberts testified that Govereh told him that he made most

10

of his money selling phony dependents. (*Id.* at 806, 818-19.)

Roberts' testimony alone would have been sufficient for the jury to convict him. *See United States v. LeQuire*, 943 F.2d 1554, 1562 (11th Cir. 1991) (uncorroborated testimony of accomplice is sufficient to support a conviction). The jury also could have convicted based on the testimony of Raymond White, Jr., who testified that defendant showed White the computer monitor screen on which defendant entered White's information on tax software. (Tr. [113] at 551-54, 578.) *See United States v. Hernandez*, 433 F.3d 1328, 1334 (11th Cir. 2005) (a jury is free to believe a thoroughly cross-examined witness).

Therefore, sufficient evidence was presented to allow the jury to convict.

### 3. Defendant's Testimony.

Defendant's brief appears to rely greatly on Govereh's testimony that he did not file the tax returns. However, a jury is free to reject a defendant's testimony and instead believe the prosecution's witnesses. *United States v. Siegelman*, 561 F.3d 1215, 1235 (11th Cir.2009) (finding that reviewing courts must respect a jury's credibility determinations); *Hernandez*, 433 F.3d at 1334 (a jury can disbelieve a defendant's defense and instead believe thoroughly cross-examined witnesses). The Court cannot substitute its own credibility determinations for the jury's. *See Siegelman*, 561 F.3d

11

at 1219 (because a jury verdict commands respect, a reviewing court cannot substitute its credibility determinations for the jury's).

Therefore, defendant cannot use his testimony as a basis for acquittal when a jury can properly arrive at its verdict based on the prosecution witnesses or the jury's disbelief of the defendant's own testimony. Accordingly, defendant's Motion for Judgment of Acquittal [98] is **DENIED**.

## II.  Motion for New Trial

Defendant moves for a new trial under Federal Rule of Criminal Procedure 33 because of: (1) insufficiency of the evidence; (2) undue prejudice from 404(b) evidence; (3) undue prejudice from non-TETR tax violations; (4) constructive amendment and variance; (5) the potential viewing of defendant in handcuffs by some jurors; (6) jury misconduct; (7) new evidence; (8) denial of certain jury instructions; and (9) improper closing argument. (Supplemental Br. [125] at 49.)

### A.    The Evidence is Sufficient to Support the Verdict.

Defendant again attacks the sufficiency of the evidence pursuant to Rule 33. Motions for a new trial based on insufficient evidence are "not favored" and should be granted only in "exceptional cases" where the evidence so weighs against the verdict "that it would be a miscarriage of justice to let the verdict stand." *Hernandez*, 433 F.3d at 1336-37 (internal citations omitted).

12

Defendant restates his attacks on the evidence, and they fail here for the same reason they failed in his Motion for Judgment of Acquittal [98]. *See, e.g.*, *Hernandez*, 433 F.3d at 1336-37 (court properly denied Rule 33 motion when jury chose to believe prosecution's witnesses, and not the defense).

## B.    Undue Prejudice from 404(b) Evidence

Defendant claims that the Court should not have admitted his Florida fraud conviction in the prosecution's case-in-chief as Rule 404(b) evidence. At the outset, the Court notes that the brevity of defendant's argument on this matter--the supplemental memorandum devotes less than three pages to this issue--does not convey the amount of attention and time that this Court devoted to the question whether the ample Rule 404(b) evidence against defendant should be admitted. The matter occupied a substantial part of the discussion during the pretrial conference, which has not been transcribed. In addition, this matter created frequent interruptions during the trial at which times the Court continued to hear arguments from defendant in opposition to the admission of this evidence. *See, e.g.*, Tr. [112] at 453-470; Tr. [[113] at 580-596; Tr. [114] at 849-869, 886). At each juncture, the Court deferred admission of any of this evidence until it could be certain that the evidence was necessary for the matters on which the Government sought its admission. Indeed, while the Court admitted the Florida conviction as Rule

404(b) evidence, it disallowed admission of the Michigan convictions during the Government's case-in-chief on Rule 403 grounds.[5]

## 1. Florida Conviction

On May 4, 2006, defendant pleaded guilty in Florida to executing a scheme to defraud customers of a gas station where he worked by stealing and using their credit card and drivers' license numbers. (Tr. [114] at 889-98.) His *modus operandi* was to tell customers that they could not use their credit cards at the pumping station, but that instead they had to go inside and show the defendant their cards and their driver's licenses. Armed with that information, the defendant was then able to use these credit cards to purchase airline tickets and other merchandise.

The Court determined that this conviction was more probative than prejudicial and permitted the Government to prove the conviction pursuant to Federal Rule of Evidence 404(b). (Tr. [112] at 458-60; Tr. [113] at 581-82; Tr. [114] at 850-57, 868-69, 886-900; Tr. [115] at 1094-96; 1132-34.)

The abuse of discretion standard applies to a review of a district court's admission of Rule 404(b) evidence. *United States v.*

_____

[5] When the defendant testified, however, the Court did permit the Government to impeach him with these felony convictions. Further, as the Michigan convictions were also properly admitted under Rule 404(b), once they had been revealed during cross-examination, the Court permitted the jury to consider them both for the purposes addressed by that Rule, as well as for impeachment purposes.

AO 72A
(Rev.8/82)

*Calderon*, 127 F.3d 1314, 1331 (11th Cir. 1997). Defendant has not met its burden of proving that the Court abused its discretion in admitting the evidence. (Supplemental Br. [125] at 51-54.)

Rule 404(b) allows the introduction of evidence of other acts of the accused that are: (1) relevant to an issue other than the defendant's character and (2) established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; and (3) the probative value must not be outweighed by prejudice. FED. R. EVID. 404(b)[6]; *United States v. Dickerson*, 248 F.3d 1036, 1046-47 (11th Cir. 2001) (finding evidence of defendant's drug activity two years prior admissible because of similarity and relevance of acts).

There was no question that the defendant committed the act: he had pled guilty to the crime in Florida. Second, willfulness was an element in the case and it appeared apparent that defendant would, as he ultimately did, contend that whatever acts he took, he did so with no intent to defraud anyone and that any acts that violated the law were done as a result of an honest mistake. That is, it was defendant's position that whatever acts he did were at the behest of someone else, more knowledgeable than he concerning tax law.

---

[6] Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b).

AO 72A
(Rev.8/82)

Moreover, while the facts underlying an extrinsic act do not have to be identical to the facts of the underlying crime, as long as both reveal a similar intent by the defendant, in this case there were substantial similarities to the conduct in question and to the state of mind of the defendant revealed by that conduct. That is, in Florida, the defendant obtained personal information from customers and then used that information to obtain money for the defendant from a third-party. Here, the defendant obtained the client's relevant tax information, then, unbeknownst to them, added false information about telephone tax expenses, without their permission, to the tax returns that he was preparing: again, with the motivation to have ill-gotten monies paid to the defendant. In both cases, the customers were on the hook for monies paid, in part, to the defendant. In the gas station incident, the customers were billed for merchandise that they never bought. In the false claims case here, clients were left holding the bag for the entire loan that the defendant had obtained for them using false information, even though the clients had not received the entire proceeds of that loan. In short, in both cases, the defendant filed false claims for payment, purportedly on behalf of an unwitting third party.

Finally, as noted above, defendant's defense was to portray himself as a dupe, used by others in his office who were actually the perpetrators and masterminds of this scheme. Any unfair prejudice

16

deriving from this evidence--and the Court concludes that there was no <u>unfair</u> prejudice--clearly did not outweigh its probative value.[7] Accordingly, the admission of this Florida conviction does not entitle the defendant to a new trial.

## 2. Michigan Conviction

Defendant was also convicted of the felony offenses of passing bad checks drawn on non-existent companies in Michigan in June 2003 and May 2004. (Tr. [115] at 1096-99.) As noted, the Court had concluded that this was appropriate Rule 404(b) evidence, but did not admit it during the Government's case because of Rule 403 concerns. Once the defendant took the stand in the trial, however, the Government was entitled to impeach him with this conviction, and the Court so permitted. *See United States v. Vigliatura*, 878 F.2d 1346, 1350 (11th Cir. 1989) (when a defendant testifies, "he places his credibility in issue" and allows the prosecution to impeach him) (internal quotation marks and citation omitted).

The Court permitted the Government to impeach defendant during

---

[7] This conviction would also have been admissible as impeaching evidence once the defendant testified, under Rule 609(a)(2), as a crime of dishonesty or a false statement that can be admitted without any balancing tests. *See United States v. Kane*, 944 F.2d 1406, 1413 (7th Cir. 1991) (misdemeanor bad check conviction found to be admissible under Rule 609(a)(2)); *United States v. Rogers*, 853 F.2d 249, 252 (4th Cir. 1988) (same); *United States v. Toney*, 615 F.2d 277, 279-80 (5th Cir. 1980) (under Rule 609(a)(2), district court has no discretion to prevent the impeachment of a witness with a prior conviction for a false statement).

17

his testimony with these fraudulent check convictions, pursuant to Federal Rule of Evidence 609(a)(1), which provides that "evidence that an accused has been convicted of a [felony] shall be admitted . . . if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." FED. R. EVID. 609(a)(1).

Again, the Court determined that the probative value of the bad check convictions outweighed their prejudicial effect. First, courts allow evidence as probative when a defendant attacks the credibility of the prosecution's witnesses. *United States v. Pritchard*, 973 F.2d 905, 909 (11th Cir. 1992) (defendant's criminal history has "special significance" when he attacks the credibility of the prosecution's witness with prior convictions); *United States v. Harris*, 720 F.2d 1259, 1263 (11th Cir. 1983) (defendant's prior conviction was admissible for impeachment when he attacked the credibility of the prosecution's witness). Through his testimony and the cross-examination by his counsel of witnesses, defendant was challenging the credibility of the prosecution's witnesses, suggesting that Roberts and the customers were conspiring to put him in prison. He also attacked several of them with evidence of prior convictions. (Tr. [108] at 280-84; Tr. [112] at 339-40; Tr. [113] at 610; Tr. [114] at 830-37, 841-43; Tr. [115] at 1094.) Not to allow those

18

convictions would allow defendant "to appear pristine while at the same time he vigorously" was attacking the credibility of the witnesses against him. *Harris*, 720 F.2d at 1263. Further, as noted, it was a close call, anyway, not to allow the Government to admit this evidence during its case-in-chief.

These Michigan convictions were felonies, but would also have been admissible even if they were misdemeanors because "forgery goes to truthfulness." (Tr. [114] at 1004). Therefore, these convictions were admissible as a matter of law under Rule 609(a)(2) because all crimes of dishonesty or false statements can be admitted without any balancing tests. *See Kane*, 944 F.2d at 1413 (misdemeanor bad check conviction found to be admissible under Rule 609(a)(2)); *Rogers*, 853 F.2d at 252 (under Rule 609(a)(2), district court has no discretion to prevent the impeachment of a witness with a prior conviction for a false statement).

### C.    Undue Prejudice from Non-TETR Tax Violations

Defendant also protests the court's admitting testimony concerning other false information, besides the charged false telephone tax claims, that the defendant included on some of the tax returns that he prepared and caused to be filed. Specifically, the Government offered evidence that the defendant also included false information about the amount of wages, the number of dependents, and

the existence of education expenses on his customers' returns. Defendant further complains that the Government introduced evidence that the defendant charged fees higher than his banks suggested and that he required additional cash payments from his customers for certain acts, such as "selling" false dependants. (Supplemental Br. [125] at 54.)

The Federal Rules of Evidence mandate that "[e]vidence of criminal activity other than the offense charged is not extrinsic under Rule 404(b) if it is: (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." *United States v. Veltmann*, 6 F.3d 1483, 1498 (11th Cir. 1993) (citations omitted); *see also United States v. Richardson*, 532 F.3d 1279, 1386-87 (11th Cir. 2008) (court found evidence of defendant's background admissible to show how he became involved with drug dealing).

In this case, the challenged evidence met all three of the above factors. The evidence unquestionably arose out of the same series of transactions: tax preparation. It was necessary to complete the story of the crime and was inextricably intertwined with the charged offense, as it showed how Govereh operated and how he gained money

20

for his scheme. *See United States v. Smith*, 122 F.3d 1355, 1359-60 (11th Cir. 1997) (court admitted evidence that defendant's companion robbed a bank three hours after the charged robbery because it was inextricably intertwined with the charged robbery); *United States v. Tampas*, 493 F.3d 1291, 1301-02 (11th Cir. 2007) (when the defendant embezzled money from a YMCA, Court found evidence that YMCA had not paid taxes was admissible because it showed source of cash for defendant's scheme and was evidence of defendant's knowledge of and access to the funds).

Additionally, the Court twice gave cautionary instructions regarding the proper use of evidence concerning Govereh's excessive fees. (Tr. [112] at 427-28; Tr. [115] at 1214-15.) For all the above reasons, admission of the above inextricably intertwined evidence does not entitle the defendant to a new trial.

### D.    Constructive Amendment and Variance

Defendant claims that his rights were violated by a constructive amendment of the indictment and a variance in the evidence.

### 1.    Constructive Amendment

A constructive amendment to an indictment occurs when the essential elements of the charged offense are altered to broaden the possible bases for conviction. *Tampas*, 493 F.3d at 1301. *See United States v. Keller*, 916 F.2d 628, 637 (11th Cir. 1990) (finding

21

constructive amendment when court instructed jury it could find defendant guilty of conspiracy if he made an illegal agreement with anyone, not just the person in the indictment).

The indictment stated that defendant knew that the returns he filed were false because "claims for income tax refunds in the monetary amounts listed below [] were made with the knowledge that such claims were false, fictitious and fraudulent in that taxpayers were not entitled to the [TETR] credits set forth." (Indictment [1] at 1-2.) However, the indictment does not allege that the TETR claims were the only fraudulent claims in the returns. (Indictment [1] at 1-2.) The information in the indictment did not state the only essential elements of the offense, but merely elaborated on some of the essential elements. *See Tampas*, 493 F.3d at 1301 (no constructive amendment when language in indictment merely elaborates on essential elements); *United States v. Ward*, 486 F.3d 1212, 1226-27 (11th Cir. 2007) (surplusage does not constructively amend an indictment). Moreover, the additional evidence was properly admitted as being inextricably intertwined with the facts underlying the offense conduct.

Therefore, there was no constructive amendment of the indictment.

AO 72A
(Rev.8/82)

### 2. Variance

Defendant also claims that he suffered a material variance because evidence was presented about other violations than the TETR credit. A material variance occurs when the facts proved at trial deviate from the facts charged in the indictment. *Ward*, 486 F.3d at 1226. A variance requires reversal only if a defendant shows that it was material and substantially prejudiced his rights. *Id.*

Defendant has not shown a variance because the indictment did not limit defendant's fraud to the TETR claims, *see supra*. Furthermore, he did not show that the evidence prevented him from presenting a defense because of unfair surprise or that the jury was confused. *See Richardson*, 532 F.3d at 1287 (no material variance when defendant failed to show unfair surprise or inability to present a defense); *United States v. Flynt*, 15 F.3d 1002, 1006 (11th Cir. 1994) (no material variance when indictment charged defendant with receiving payments from other party, and evidence showed he received payments from other party's company). Finally, the above evidence was either proper Rule 404(b) evidence or inextricably intertwined with the evidence concerning defendant's offense.

### E. The Viewing of Defendant in Handcuffs

Defendant argues that a new trial is necessary because several jurors may have momentarily seen the defendant brought into the

23

courtroom in handcuffs. (Supplemental Br. [125] at 60.) Unfortunately, although this matter was discussed at a couple of different points during the trial, defendant has not assisted the Court by providing citations to the transcript. Accordingly, it has been necessary for the Court to conduct its own time-consuming search throughout the various volumes of the transcript to try to find any references to the matter.[8]

The transcript reveals that, because the Court's own prisoner elevator was broken, a deputy marshal brought the defendant up through another judge's elevator and had the defendant cross in front of the courtroom before coming inside. This occurred during a lunch break during voir dire. While the marshal believed that the jurors were not in a position to see the defendant, because they had been placed behind a wall partition that did not permit them to view the entry to this Court's courtroom, unfortunately, as many as 10 of the 40 prospective jurors were in a position where they might have been able to see the defendant. Thus, at most, these 10 jurors, who may not have even been selected to serve on the jury, may have

---

[8] The defendant did not order that part of the transcript that would have reflected a conference in chambers when defense counsel first became aware of the matter. The Court has therefore been able to rely on those parts of the transcript provided, but believes that these parts of the record cited herein provide most, if not all, of the pertinent information.

24

momentarily glimpsed the defendant handcuffed. (Vol. 1 at 17-31.)

The Court denied the defendant's motion for a mistrial, concluding that such a momentary glimpse of the defendant did not warrant a mistrial. (Vol. 2 at 35-44.) As the Court noted at the time, a defendant is potentially prejudiced when he is seen by a jury in handcuffs or shackles because the jury may infer that the defendant is dangerous, given the conditions of his detention. Further, the repeated observation of a defendant in shackles or handcuffs could serve to dehumanize the defendant before the jury. As to the first concern, however, the Court explained that most jurors assume that a defendant is in custody because he has been accused of a crime, and not because he is necessarily dangerous. Indeed, in this case, the jury properly learned, through a stipulation agreed to by the defendant, that the defendant had remained in custody since the date of his arrest. As to any "dehumanization," the Court noted that the defendant was sharply dressed in a nice suit and made an attractive and sophisticated appearance. A juror's momentary glimpse of him in handcuffs could not have been unduly prejudicial.

Defendant claims, however, that his presumption of innocence was nullified by the possible momentary, chance sighting of him in handcuffs. Numerous cases state that a defendant "is not necessarily

prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs." *Gates v. Zant*, 863 F.2d 1492, 1501 (11th Cir. 1989) (listing cases); *see also United States v. Maclean*, No. 06-14298, 2007 WL 1593246, at *6 (11th Cir. June 4, 2007) (denying motion for mistrial when jurors saw defendant in handcuffs because any suggestion of prejudice was "completely speculative") (internal quotation marks omitted); *Allen v. Montgomery*, 728 F.2d 1409, 1414 (11th Cir. 1984) ("the necessity of courtroom security sometimes outweighs a defendant's right to stand before the jury untainted by physical reminders of his status as accused"). Defendant would have to "make some showing of actual prejudice" to argue for a new trial, and he cannot. *Gates*, 863 F.2d at 1501.

Finally, and most importantly, defendant's claim that he was prejudiced during voir dire because some jurors may have momentarily seen him in handcuffs was later mooted by defendant's own trial stipulation that he had been in custody since the time of his arrest in February 2007. Defendant sought this stipulation because the Government indicated that, otherwise, it would seek admission of evidence to show that the defendant was in fugitive status as to his immigration release at the time of his fraud and of his arrest. (Tr. [112] at 461-67.) Clearly, with this stipulation, the jury was properly aware that the defendant was in custody, and any prior

momentary glimpse of the defendant in handcuffs would be consistent with that awareness. Therefore, the Court concludes that defendant's request for a new trial on this ground also fails.

### F.    Possible Jury Misconduct

Following the rendering of the jury's verdict on the morning of January 16, 2008, juror Tameka Braswell wrote an e-mail to defendant's attorney shortly before midnight that evening, stating that she had some doubts about her verdict. (Letter [98-2].) She stated that she was not sure about the charge because she did not think the instructions properly stated what the jury was charged with determining. (*See id.* at 1.) She criticized what she believed to be the faulty analysis of her fellow panel members. She noted her opinion that the trial was swayed by "racially (*sic*) bias" although it was not racist. *Id.* She inquired why certain witnesses were not called to testify. Ultimately, notwithstanding her concerns about whether the prosecution had properly shouldered its burden of proof, however, she indicated her belief that the defendant was guilty, albeit a scapegoat. ("I don't think that the defendant is innocent; I do believe that he was the scapegoat." (*Id.* at 2.)

The Court reads Ms. Braswell's email as expressing some regret that she had voted to convict the defendant and some pity for the defendant's fate. Such an emotion is not uncommon with some jurors

27

after they have rendered their verdict. Voting to convict another person can create a heavy burden for some jurors; a second-guessing of one's decision is not an uncommon reaction in these situations. Defendant attempts to extrapolate from Ms. Braswell's email, however, the possibility of racial bias by the jury or of their use of extrinsic information. The Court concludes that defendant's assertions constitute nothing more than speculation, unsupported by Ms. Braswell's email.

In assessing a claim of jury misconduct, it is important to note the firmly established common law rule prohibiting the use of juror testimony to impeach a verdict. *Tanner v. United States*, 483 U.S. 107, 117 (1987). Federal Rule of Evidence 606(b) states that when inquiring into the validity of a verdict, a juror cannot "testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes." FED. R. EVID. 606(b). This rule "protect[s] jurors from postverdict investigation" and "endless attack." *Siegelman*, 561 F.3d at 1241 (harmless error for jurors to be exposed to media reports).

The only exception is if: (1) "extraneous prejudicial information was improperly brought to the jury's attention," (2) "any

outside influence was improperly brought to bear upon any juror," or (3) "there was a mistake in entering the verdict onto the verdict form." *United States v. Benally*, 560 F.3d 1151, 1153 (10th Cir. 2009). Braswell's email provides no evidence to support the applicability of any of these exceptions.

Defendant argues first that racial bias may have infected the jury's deliberation, based on Ms. Braswell's vague speculation that the jury might have been "definitely swayed, racially bias(sic)(although not racist). It is difficult to discern the distinction that Ms. Braswell is attempting to make between being swayed by racial bias, but not being racist. At any rate, Ms. Braswell never offers any specific statements that a juror may have made to suggest racial bias. She only "thinks" that this may have been the case. Such speculation by Ms. Braswell does not constitute evidence of actual racial bias. Moreover, the Court's notes regarding jury selection indicate that one-third of the jury (four jurors) were black. The verdict was necessarily unanimous. For all of the above reasons, defendant has failed to show that racial bias played a role in the jury's verdict.

Defendant also contends that jurors "may have consulted [] extrinsic sources prior to the jury's return of its verdict." (Supplemental Br. [125] at 68.) Because jurors are presumed to be

29

impartial, *Siegelman*, 561 F.3d at 1237, defendant must overcome this presumption with evidence. Ms. Braswell's email does not indicate that jurors received extrinsic information during the trial.

Defendant bases its speculation that jurors may have looked at extrinsic evidence on Ms. Braswell's reference, presumably derived from an internet search, to a news item that showed a photograph of one of defendant's putative co-conspirators sitting behind a computer. Ms. Braswell made mention of this picture in the section of her letter that was "not meant to question (defense counsel's) expertise," but nevertheless subtly offered, in bullet point, some suggestions as to how defense counsel could have strengthened his case. Thus, in addition to inquiring why "Tauya, Kendra, Rasheeda, Kalia, etc." were not brought in as witnesses, Ms. Braswell also asked: "Could the picture of Tauya in the CBS interview, behind the computer be used in this case? Or the article that state that Tauya fired him and claimed to be the president of the company." Presumably, Ms. Braswell felt that the photograph and admission by Tauya could have benefitted the defendant, had it been elicited at trial.

Ms. Braswell goes on, in her bullet points, to opine that defendant's intent was established solely on the fact that the defendant had previously engaged in fraudulent activities and wonders

30

what the other jurors would have done had they known about defendant's other criminal charges "if they hadn't already."

From the above random opinions and criticism of the verdict (on which she had agreed) by Ms. Braswell, defendant wonders whether other jurors may have inserted Mr. Govereh's name into an internet search during the trial and discovered the above article. Yet, Ms. Braswell said nothing of the kind. Had her fellow jurors discussed an internet search or discussed facts that had not been admitted into evidence, one can safely assume that Ms. Braswell would have disclosed that in her email, as she was attempting to mount criticisms of the deliberative process of her fellow jurors.

Second, defendant speculates whether Ms. Braswell, herself, might have performed the internet research that yielded the above-described information during the trial, as opposed to the twelve-hour period of time following the announcement of the verdict and Ms. Braswell's email to counsel. Again, Ms. Braswell does not indicate that she conducted any internet research during the course of the trial. Indeed, this Court always very forcefully instructs the jurors at the beginning of a trial, and repeats the instruction each evening before recessing, that jurors are absolutely forbidden from conducting internet research or any other independent inquiry into the subject matter of the case while the trial is ongoing. The Court

31

followed that practice in this case. *See* Tr. [107] at 15-16; Tr. [108] at 286-87; Tr. [112] at 452; Tr. [113] at 744; Tr. [114] at 995-96; Tr. [115] at 1229. A more reasonable inference is that, still mulling over the verdict and evidence, Ms. Braswell did internet research following the conclusion of the case. Accordingly, absent some statement by Ms. Braswell indicating that she received extraneous information during the trial, the presumption against such an inference remains.

Moreover, there is no indication that Ms. Braswell construed the information in this article as being *prejudicial* to the defendant. Indeed, she references exculpatory material in the article that she wishes defense counsel had focused on: that is, the photograph of a co-conspirator sitting behind the computer in the office and the fact that Tauya had fired the defendant and that Tauya claimed to be the president of the company. (Defendant had testified and his counsel had argued that others, including Tauya Muteke, who was the supposed ringleader, were responsible for the fraudulent tax filings). Ms. Braswell clearly viewed such information as being helpful to the defendant because she questioned why defense counsel had not used it.

She does question whether the Government had proved defendant's fraudulent intent, noting that it had been "established solely on his (Tony) ability to execute credit card fraud and write bad checks (I

32

couldn't image (sic) what they would have done had they known the other charges, if they hadn't already)." Presumably, the article indicated the existence of criminal charges against the defendant, in addition to those already disclosed to the jury. Ms. Braswell does not set out what those other charges were. At any rate, she pooh-poohs the significance of other criminal charges and makes clear her belief that any prior criminal conduct by the defendant did not establish his intent in this case. In short, Ms. Braswell does not indicate that she received extraneous information during the trial and, further, she makes clear that she does not believe that the information to which she referred in her email caused her to believe that the Government had proven its case. Indeed, as noted, Ms. Braswell expressed her belief that parts of the news item were exculpatory.

In short, the Court concludes that juror Braswell's email does not provide sufficient reason to question the fairness of the deliberation process or to grant a new trial.

### G.    New Evidence

Defendant states that he is entitled to a new trial based on newly-discovered evidence: specifically, a photograph that Braswell sent him that shows someone else sitting at the computer that was used to file the fraudulent returns. (Supplemental Br. [125] at 68.)

AO 72A
(Rev.8/82)

Apparently, this was the same photograph to which Ms. Braswell referred in her email to defense counsel.

To obtain a new trial based on new evidence, a defendant must show that the new evidence is (1) "discovered after trial"; (2) "not merely cumulative or impeaching," (3) "material," and (4) "of such a nature that a new trial would probably produce a different result"; and (5) "the defendant exercised due care to discover the evidence." *United States v. Thompson*, 422 F.3d 1285, 1294 (11th Cir. 2005). The failure of any of these elements is fatal to the motion. *Id.*

While the Court will assume that this new "evidence" was discovered after trial, defendant has failed to show that the evidence was material, that it would likely have produced a different verdict had it been admitted, or that the defendant exercised due care to discover the evidence. First, the Court cannot conclude that this photograph is material or that it would have changed the jury's verdict. Evidence already established that defendant did not have exclusive control over the computer in the office. Roberts had testified that he also used the computer. (Tr. [114] at 807-09, 838.)

Further, it appears clear, from a reading of the internet article referenced by defendant and containing the photograph in question, that the photograph was taken during the interview by the

34

reporter of Tauya Muteke. This is obvious because the reporter is in the photograph with Mr. Muteke. As this photograph was taken after the defendant's arrest, when the proverbial jig was up, it is not clear how Muteke's presence near the computer would shed any light on the defendant's earlier use of that computer to effect his fraud. In short, the Court concludes that admission of this evidence would not have affected the outcome of trial. *Cf.*, *United States v. Bornscheuer*, 563 F.3d 1228, 1236 (11th Cir. 2009) (affirming district court's denial of new trial because newly discovered evidence was merely cumulative and would not have affected the outcome); *United States v. Chung*, No. 08-10500, 008-14118, 08-14447, 2009 WL 1279128, at *4 (11th Cir. May 11, 2009) (denying motion for new trial because newly discovered evidence was immaterial).

Finally, and decisively, defendant has failed to show that he exercised due care to discover this evidence. Defendant, through his counsel, could have readily inserted the words "Govereh" and "tax" into an internet search engine, and readily discovered the photograph.

For all the above reasons, the Court concludes that defendant has failed to show that a new trial is warranted based on the discovery of new evidence.

AO 72A
(Rev.8/82)

## H.  Jury Instructions

Defendant argues that the Court erred in failing to give his proposed jury instructions concerning: (1) reliance on a misrepresentation by a government official, (2) good faith misunderstanding of the law, and (3) reliance on a tax preparer. (Supplemental Br. [125] at 71-73.)

Defendant's two-page argument on this point does not convey the extent of the discussion between the Court and counsel concerning defendant's late requests on these issues. *See* discussion at Tr. [115] at 1123-24, 1126-42, 1144-53.) Nor does defendant accurately note that the Court gave the gist of some of what the defendant sought, albeit not in the precise words requested. Moreover, in choosing to give the instructions that it ultimately gave, the Court accorded the defendant great leeway, as the defendant had failed to establish a factual predicate for any of these instructions.

Finally, defendant's requests on these charges was untimely. As it always does, the Court set a deadline prior to trial for the submission of proposed requests to charge. Although defense counsel was aware that the Court would be preparing jury instructions over the weekend following recess of the proceedings on Friday evening, on Monday morning, after the close of his case and shortly before the jury was to return to hear closing argument, defense counsel

36

submitted the new instructions that are now at issue. (Tr. [115] at 1123-24.)

### 1. Reliance on Misrepresentation by Government Official

Defendant argues that the Court should have instructed the jury that defendant's actual and reasonable reliance upon a misrepresentation on a point of law by a Government official is a defense to the charged offense. (Tr. [115] at 1126.) Defendant contended that he believed that another employee at this tax preparation office, Kendra Robertson, worked for the IRS and it is she who defendant offers as the Government official on whom he relied.

In requesting this instruction, defendant was apparently relying on an "entrapment-by-estoppel" defense. This defense arises when "a government official incorrectly informs a defendant that certain conduct is legal, the defendant believes the government official and is then prosecuted for acting in conformity with the official's advice. *United States v. Johnson,* 139 F.3d 1359, 1365 (11th Cir. 1998). To assert this defense to a federal crime, the official in question must have been a federal official. *United States v. Funches,* 135 F.3d 1405, 1407 (11th Cir. 1998). Further, "[t]his defense is a narrow exception to the general rule that ignorance of

37

the law is no excuse and is based on fundamental fairness concerns of the Due Process Clause. _The focus of the inquiry is on the conduct of the Government not the intent of the accused_." *United States v. Spires*, 79 F.3d 464, 466 (emphasis added). Finally, the defendant must actually rely on a point of law misrepresented by the federal official, and this reliance must be objectively reasonable. *United States v. Eaton*, 179 F.3d 1328, 1332 (11th Cir. 1999)(internal quotation marks omitted).

Defendant did not present evidence entitling him to an instruction embodying an entrapment-by-estoppel defense. The first requirement for the defense is that the advice in question be given by a federal official. There is no evidence that Kendra Robertson was an IRS employee. Defendant's only basis for this assertion is that someone in the office told him that she was an employee and that she had confirmed that information. Even assuming that someone had so informed the defendant, that information does not prove that Robertson was, in fact, employed by the federal government. Thus, on this record, there is no evidence that Robertson was a Government official.[9]

---

[9] As the Court noted at the time, defendant had ample time to seek discovery as to whether Ms. Roberts worked for the IRS. (Tr. [115] at 1126-27.) That he did not do so undermines his present claim that he believed Ms. Roberts to have worked for the IRS.

AO 72A
(Rev.8/82)

Moreover, as noted, it does not matter that defendant may have claimed that he believed Robertson was a Government agent. As noted *supra*, the focus of the inquiry is on the conduct of the Government, not the intent of the defendant.

Second, it was never the defendant's contention that he had innocently filed returns that exaggerated the telephone excise taxes of clients based on the erroneous advice of Robertson. Indeed, to the contrary, it was defendant's testimony that he never filed returns claiming false excise tax credits. It was defendant's consistent story that others in the office--usually Kendra, but never the defendant--prepared and filed these returns. *See, e.g.,* Tr. [114] at 984, Tr. [115] at 1013-1014, 1026, 1031, 1058-59, 1068-75, 1107. As it was defendant's testimony that he was not involved in the claiming of any telephone excise credits for clients, it is therefore impossible that he would have been relying on the opinion of anyone for actions he never took.[10]

---

[10] It is true that defendant testified that he did obtain specific advice from Tauya and Robertson that it was okay to sell dependents to a client. That is, defendant claimed that these individuals told him that a tax preparer could take a legitimate dependent from someone else and, for a fee, let a client use that dependent's *social security number* and *name* on the client's own return to get a dependent credit. *See, e.g.,* Tr. [115] at 1040-1048. Although the defendant never put such dependents on anyone's tax return--again, given his position that he did not prepare tax returns--he did collect money from the clients for this sale. (*Id.*

AO 72A
(Rev.8/82)

Third, had defendant actually prepared tax returns containing false TETR credits and had he received specific advice from someone else in the office that it was okay to falsify this information, his reliance on any such advice would not have been objectively reasonable. This case charged the knowing submission of a false claim to the Government. It is difficult to understand how one could reasonably rely on the representation of a co-worker that it is proper to lie on a return.

Finally, as discussed *infra,* although the defendant was not entitled to a good faith charge, the Court nevertheless did instruct the jury that "a good-faith misunderstanding of the law or a good-faith belief that one is not violating the law therefore negates willfulness." (Tr. [115] at 1220.) That instruction gave the defendant room to argue that he relied on the advice of others and gave the jury authority to acquit the defendant if it concluded that he had done so.

In short, defendant failed to establish a factual predicate for an entrapment-by-estoppel defense, and the Court properly declined to give defendant's requested instruction

---

at 1047-48.) In addition, while the false dependent claims were introduced as inextricably intertwined evidence, defendant was not charged with filing false claims regarding dependents. He was charged with filing false claims regarding the telephone excise tax credits.

### 2. Good Faith Instruction

Defendant states that the Court did not instruct the jury about good faith. On the contrary, as noted, the Court did instruct the jury that "[a] good faith misunderstanding of the law or a good faith belief that one is not violating the law therefore negates willfulness." (Tr. [115] at 1146-55, 1220.) Further, the Court gave this good faith instruction, although the defendant had failed to lay a factual predicate for it. *See* discussion at Tr. [115] at 1123-24, 1126-30, 1146-53. Although the Court did not use defendant's exact proposed language, its instruction covered the substance of the request.

### 3. Reliance on Tax Preparer

Though defendant testified that he did not prepare returns, he wanted an instruction for an alternate defense, unsupported by any evidence, that if the jury found he had prepared forms, it should consider, as a defense, his reliance on a tax preparer. (Supplemental Br. [125] at 72.) This instruction was presented at the eleventh hour, right before closing, by the defendant *pro se.* The Court deemed it to be untimely. (Tr. [115] at 1140).[11]

---

[11] Defense counsel marked this request and asked that it be made part of the record. The docket entry [91] inaccurately reflects this request as a proposed instruction by the Government: understandably so, as the instruction's caption is: "Government Proposed Jury Inst.

Moreover, on the merits, the requested instruction was not remotely apt. The proposed instruction addresses the defense of a tax filer who has provided accurate information to a tax preparer and who relies, in good faith, on the work of that preparer. This defense is intended for an individual filer who has been charged with filing a false return. Defendant has offered no authority that a tax preparer can invoke the defense of reliance on another tax preparer. (Reply [136] at 34.)

Furthermore, defendant was not entitled to this defense because he offered no specific testimony as to what information he had provided the preparer for a particular return and whether that information represented a complete disclosure of the relevant information. *See United States v. Williams*, 573 F.2d 284, 292 n.7 (5th Cir. 1978) (defense requires showing of good faith reliance on a professional tax preparer, disclosure of all relevant facts, and no reason to believe the return was false)[12]; *McGraw v. Comm'r of Internal Revenue*, 384 F.3d 965, 972-73 (8th Cir. 2004) (same).

---

No. 371." Yet, this was apparently an instruction that the defendant had obtained from another source and this document was the defendant's own request for an instruction as to reliance on a tax preparer.

[12] This case is binding precedent in the Eleventh Circuit; *see Bonner*, 661 F.2d at 1207.

42

Taking defendant's testimony in the best light, he merely provided assistance to others who actually prepared the returns. Again, his defense was that he did not prepare or file the tax returns in question. To the extent that his "alternative" defense was that, even if he did file, or assist in the filing of these returns,[13] he did so, thinking that the actual tax preparers had done their work correctly, the Court's other instructions informed the jury that the defendant must have acted knowingly and willfully and further that if the defendant had a good faith belief that he was acting lawfully, then this would constitute a defense to the charge. The instructions given conveyed the gist of what defendant sought in his inapt and confusing tax preparer instruction.

## I.    Prosecutor's Comments on Flight and the Evidence

Defendant claims that the prosecutor should not have commented on defendant's flight from arrest and that the cumulative effect of the prosecutor's comments tainted the trial.

---

[13] The defendant's alternative defenses are somewhat reminiscent of the much-parodied defense of an accusation that a defendant's dog had bitten the plaintiff. That defense was: "I don't own a dog. If I did own a dog, he didn't bite you. And if he bit you, you provoked him." Here, defendant's position is that he never prepared or filed any returns. If he had done so, however, he would not have known that any information contained therein was false. But, if he had known that the information was a lie, that would also be okay, because other people in the office told him that it was alright to put false information on tax returns.

43

## 1. Flight

Defendant argues that the prosecutor violated the Constitution by commenting, in his closing argument, on defendant's silence at the time of his arrest. (Supplemental Br. [125] at 73-75.) The Government contends that the comment was directed toward defendant's attempted flight when officers attempted to arrest him.

Defendant was arrested on February 15, 2007, after he saw agents searching his business and then sped away in his car, despite their orders not to. (Tr. [108] at 164-71.) Defendant's position, throughout his testimony, had been that during most of the time that he was working at the Icon office, he was unaware that false returns were being prepared, but that by the time of the arrest, he was beginning to have some concerns. (Tr. [115] at 1107-11.) The prosecutor's remark in closing focused on the inconsistency between defendant's exculpatory testimony and this flight. (*Id.* at 1170-71.)

The prosecutor first anticipated that defense counsel would repeat remarks that the latter had made in his opening statement to the effect that it is inconceivable that the defendant would commit such a substantial tax fraud and leave a paper trail with his name connected. The prosecutor argued that the defendant never expected that he would be caught by federal authorities before he had a chance

44

to disappear.[14]   (*Id.*)

The prosecutor then noted:

> And you know that he knew exactly what he was doing, because when Special Agent Horton's colleagues showed up at the Norcross location wearing their blue and gold windbreakers, having badges appear, having jackets that said federal police, the defendant didn't come forward and say, oh, I've been dying to tell you some things about this business. I'd really like to cooperate with you about what's going on here associated with Kendra, associated with Tauya Muteke, associated with everybody else that is committing this fraud.
>
> What the did the defendant do?  He didn't stop.  He didn't get out of the car.  He didn't raise up his hands and say I really need to talk to you.  He tried to take off....

(*Id.* at 1171.)

At the outset, the Court notes that defendant's claim will be reviewed on appeal only for plain error, as defendant did not object to the prosecutor's remarks, nor did he ask for curative instructions.  FED. R. EVID. 103(d) (court can "tak[e] notice of plain errors affecting substantial rights although they were not brought to the attention of the court").  The plain error exception should be "used sparingly, solely in those circumstances in which a miscarriage

---

[14]   Although the jury was not informed, the defendant was on fugitive status from ICE authorities, as he had failed to report in Michigan, as required by the terms of his release on asylum status. As noted, after absconding from Michigan, the defendant had gone to Florida, where he was convicted of a fraud crime, and was in Georgia, involved in the fraudulent tax scheme on trial, at the time of his arrest.

AO 72A
(Rev.8/82)

of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15 (1985) (internal quotation marks omitted). The remarks must be viewed in the context of the entire trial, *id.* at 12, 16, and "improper comments during closing argument rarely rise to the level of reversible error." *United States v. Wilson*, 985 F.2d 348, 353 (7th Cir. 1993).

Had defense counsel considered this remark to be unfairly prejudicial, he should have asked for a curative instruction. Likely, however, defense counsel purposely and prudently decided not to object, because an objection would probably have precipitated an unhelpful instruction to the jury. Specifically, the Court would have told jurors that while a defendant has no obligation to answer an agent's questions, the jury could nonetheless consider defendant's attempted flight *as a possible acknowledgment of some guilt.*

Moreover, this case does not present the "miscarriage of justice" addressed in *Young*, 470 U.S. at 15. Indeed, in considering the defendant's current claim, one must consider the legal framework in which such a claim may properly be made. Defendant is apparently relying on *Doyle v. Ohio*, 426 U.S. 610 (1976), and the line of cases that follow it. In *Doyle*, the Supreme Court held that, where a defendant in custody has been given his *Miranda* warnings, he has been implicitly assured that his silence will carry no penalty.

46

Therefore, a prosecutor's comment at trial on that silence, as being inconsistent with a later-told exculpatory account, constitutes something akin to bait-and-switch, and is not permitted.

In this case, there was no testimony concerning whether or not the defendant had been silent following the giving of *Miranda* warnings, nor did the prosecutor make any such comment. Rather, the prosecutor was pointing out the defendant's attempted flight prior to his arrest, and noting that this flight was inconsistent with defendant's exculpatory accounts of his conduct during his testimony.

It is undisputed that flight from arrest may be considered as evidence of guilt. *United States v. Williams*, 541 F.3d 1087, 1089 (11th Cir. 2008); *United States v. Wright*, 392 F.3d 1269, 1277-78 (11th Cir. 2004). To be sure, flight typically involves silence on the part of a suspect, as a fleeing defendant usually has little inclination or time to engage in conversation with the police. Here, the prosecutor mentioned briefly this flight and noted its inconsistency with the exculpatory version of events recounted by the defendant at trial. The Court does not view the prosecutor's isolated comment as being violative of the *Doyle* line of cases.

Therefore, the Court concludes that this comment by the prosecutor does not entitle the defendant to a new trial.

47

### 2. Cumulative Effect

Defendant also claims that other comments made by the prosecutor during summation and rebuttal were improper and denied the defendant a fair trial. Again, because defendant did not object at the time of the comments, this claim is reviewed only for plain error.

The Court concludes that none of these remarks rendered defendant's trial unfair nor necessitate a new trial.

### CONCLUSION

Therefore, for the foregoing reasons, defendant's Motion for Judgment of Acquittal [99] and Motion for New Trial [99] are **DENIED**.

So ORDERED this _5_ day of January, 2010.


_____
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)